258 January 24, 2024 No. 35

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHAYNA LYNN HAMILTON,
*Defendant-Appellant.*

Jackson County Circuit Court
18CR31535; A172776

Laura A. Cromwell, Judge.

Argued and submitted June 21, 2022.

Francis C. Gieringer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

POWERS, J.

Convictions on Counts 1 and 3 reversed and remanded; remanded for resentencing; otherwise affirmed.

**POWERS, J.**

Defendant appeals from a judgment of conviction for two counts of driving under the influence of intoxicants (DUII), ORS 813.010 (Counts 1 and 3), and two counts of reckless driving, ORS 811.140 (Counts 2 and 4), arising out of two traffic stops. Among her contentions advanced on appeal, she argues that the trial court erred by denying her motion to suppress evidence of her refusals to perform field sobriety tests (FSTs) during both stops. We conclude that, under *State v. Banks*, 364 Or 332, 434 P3d 361 (2019), refusals to perform FSTs—like refusals to perform breath tests—may be admitted as evidence of guilt if the state proves that law enforcement's requests to perform the tests could be understood only as a request to submit to the physical act, and not as a request that defendant provide constitutionally significant consent to the tests. Here, the state did not meet that burden, and therefore we conclude that the trial court erred in admitting evidence of defendant's refusals to participate in the FSTs. We further summarily reject all but one of defendant's remaining assignments of error. Accordingly, we reverse and remand.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   *Standard of Review*

In reviewing the denial of a motion to suppress, we accept the trial court's factual findings that are supported by the evidence and determine whether the court correctly applied legal principles to those facts. *State v. Brandes*, 317 Or App 672, 674, 506 P3d 431 (2022). In so doing, we limit our discussion of the facts to the record that was developed at the pretrial hearing. *Id.* We begin with the undisputed background facts for both stops, which were presented at the hearing on defendant's motion to suppress and included video footage from the stopping deputies' body cameras on October 21, 2017, and January 6, 2018.[1]

---

[1] Defendant was also charged with two counts of unlawful possession of a controlled substance related to the January 2018 stop. The state dismissed those charges, as well as an additional charge of DUII on a later date in January 2018. The jury acquitted her of additional charges of DUII and reckless driving that were based on an April 2018 encounter.

B.   *October 21, 2017, Incident*

      Around midnight on October 21, 2017, Deputy Brown was dispatched to a report of a white Toyota Camry that was weaving back and forth and failing to stay in its lane. When Brown located the vehicle, he saw it cross into the opposite lane by about four feet before quickly moving back into its own lane. Brown initiated a traffic stop.

      After the Camry pulled over, Brown approached the vehicle, which defendant was driving. Although it was not raining at the time, the windshield wipers were moving at full speed, and defendant struggled to shut them off and find the switch to roll down her window. Brown explained to defendant that he saw her go over the double yellow line and that he observed that she was alternately braking and accelerating. He asked if there was a reason that she was driving that way, and defendant responded that she was driving home from work and was exhausted from working a long day.

      Brown told defendant that she was called in as an impaired driver and asked if defendant was on medications or had taken any drugs. Defendant said no. He told defendant that he had "concerns about [her] ability to safely operate a vehicle" and then asked, "So what I would like to do is I would like to administer some standardized field sobriety tests to make sure that you're safe to drive back to Dixie. Okay? Is that something that you would voluntarily consent to doing tonight?" Defendant refused. She told Brown that she had worked a long day with no breaks and had not eaten that day. Brown responded, "But here's the deal, if you're just exhausted *** if you consented to the field sobriety tests and I was to administer those and you don't show indicators of impairment, *** exhaustion is not an intoxicant that I'm looking for. *** And if you're not impaired, you're not impaired and you're going to be able to drive home." Brown and defendant continued to discuss her driving, and Brown asked again, "So I'm going to ask you one more time. I would like to administer some standardized field sobriety tests to make sure that you're good to go." Defendant replied that she was not willing to take any sobriety tests.

Brown read defendant her *Miranda* rights and pro-vided the so-called *Rohrs* admonishment, which is derived from *State v. Rohrs*, 157 Or App 494, 499, 970 P2d 272 (1998), *aff'd*, 333 Or 397 (2002). Brown told defendant, "So I'm going to read you the *Rohrs* admonishment. I'm going to ask you to submit to a purely physical field sobriety test. None of these tests I will ask you to perform will require you to reveal your thoughts, beliefs, or state of mind." Brown described the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand test. After each description, he asked, "Are you willing to perform this test?" and each time defendant refused. He asked, "Are you willing to perform any tests that I'm going to ask you to perform tonight?" and defendant refused. Brown then arrested defendant.

Deputies searched defendant's car following her arrest and discovered a prescription bottle containing vari-ous pills in the car. Brown testified at the suppression hear-ing that he did not search the trunk but that he could not remember exactly where he found the bottle. Defendant consented to providing a breath sample and, at the police station, consented to providing a urine sample. The breath sample returned a 0.00 blood alcohol content (BAC), and the urine sample tested positive for various substances includ-ing opioids and muscle relaxers, including buprenorphine, norbuprenorphine, carisoprodol, meprobamate, alprazolam, alpha-Hydroxyalprazolam, and phentermine.

C.  *January 6, 2018, Incident*

Deputy Hohl was on duty on January 5, 2018, when shortly before midnight a white Toyota Camry was reported to be running red lights and swerving in its lane. He located the vehicle and observed it go across the fog line and almost into a ditch, jerk back into its lane, and then cross over approximately seven feet beyond the center line and into the opposing lane of travel before jerking back into its lane again. Hohl initiated a traffic stop.

When Hohl approached the vehicle, the windshield wipers were on, despite it being a clear night. Defendant's speech was slow, and she seemed confused and disoriented. Hohl told defendant that he stopped her because she was

going all over the road and that he saw her almost crash four times. He asked if she had consumed any prescriptions, marijuana, or alcohol. Defendant said that she had not and explained that she was exhausted from working a long shift at work and was distracted picking up her bags off the floor.

Hohl told defendant that her driving and statements were concerning and then asked, "So I was wondering if you would be willing to consent to some field sobriety tests to make sure you are * * *." Defendant interrupted him and said, "Absolutely not." Hohl reiterated how poor defendant's driving was and asked again if she was taking medications. Defendant said that she was not.

At this point, Deputy Osborne, who was a certified drug recognition expert, or DRE, had arrived at the scene and explained to defendant that he thought that she had "cognitive issues" that were impacting her physical movements and that her speech was slow and slurred. Defendant responded that she was tired. Osborne explained that if it was just tiredness, they would be able to see that in the tests, and he asked, "So what I would like to do is ask you to volunteer to do some field sobriety tests." Defendant refused. Osborne explained the tests that he was asking her to perform, including an eye test, walking a line, and holding one foot in the air. He asked, "With that knowledge, you're—you're not willing?" Defendant again said no, reiterating that she had not had anything to drink but was tired and needed to go home.

Osborne then said:

"Let me read you something. Okay? I want to read this to you. Okay?

"I am going to ask you to submit to—to purely physical field sobriety tests. None of the tests I will ask you to perform will require you to reveal your thoughts, beliefs, or state of mind.

"The tests will include the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand test. So pay attention to what I'm saying. Okay?"

He described the tests and demonstrated each of them for her physically. He asked if she had any questions

about the tests and said, "Your refusal or failure *** to submit to these purely physical tests may be used against you in a civil or criminal proceeding. *** Do you understand that?" Defendant answered that she did. Osborne stated, "So I would really appreciate your cooperation in this." Defendant again refused. Osborne asked if she would "mind doing a couple alternative tests" and described those. Still, defendant refused.

The deputies had defendant get out of her car and placed her under arrest. Osborne continued to question why defendant would not perform the tests, stating, "I'm just boggled in my mind. *** I mean, clearly, you're not thinking right. I mean I just don't understand. I mean they are voluntary tests and you can refuse." Defendant refused the tests and later was charged with DUII and reckless driving.

In a search incident to arrest, Osborne found numerous pills in defendant's purse, which he identified while conducting the search using a particular website that was recommended as part of his DRE training. Defendant was read her *Miranda* warnings and transported to the sheriff's office, where she consented to a breath sample that returned a 0.00 BAC. After defendant refused to provide a urine or blood sample, Osborne applied for and executed a telephonic warrant to obtain a urine sample, which came back positive for amphetamine in addition to the same substances as the October 2017 sample.

D.   *Procedural History and Arguments on Appeal*

Before trial, defendant sought to suppress any evidence of her refusal to perform FSTs for both the October 2017 and January 2018 stops. She asserted, among other arguments, that admitting that evidence would be a violation of her rights under Article I, section 9, of the Oregon Constitution and *Banks*. The court denied defendant's motion after determining that (1) the deputies' reading of the *Rohrs* admonishment on both occasions clarified that they were asking only that defendant submit to physical tests and (2) *Banks* did not apply to the circumstances of this case because of differences between the FST and breath test implied-consent statutes. Accordingly, evidence

of defendant's refusals to perform the FSTs was admitted at trial, and the court instructed the jury that it could consider defendant's refusals as evidence of her guilt.

## II. *BANKS* AND REQUESTS TO PERFORM FSTs

### A. *Arguments on Appeal and* Banks

On appeal, defendant renews her Article I, section 9, argument that the rule announced in *Banks* regarding requests for breath tests also applies to requests for FSTs.[2] Because defendant's argument hinges on an interpretation of *Banks*, we begin our analysis with an examination of that case.

The defendant in *Banks* was involved in a single-car crash and was arrested at the scene and transported to the police station after officers determined that he was intoxicated. At the station, the officer explained that he would like the defendant to open his mouth and asked, "'Can I look in your mouth,' defendant responded, 'No.'" The officer explained that "'if you don't [open it], then I can't help you maybe take a breath test,'" and the defendant "responded that he would not open his mouth." *Banks*, 364 Or at 334 (brackets in original).

> "[The officer] explained that defendant was 'about to be asked to submit to a breath test * * * under the implied consent law,' and [the officer] provided information on the consequences for refusing or failing the test, including that his refusal to submit to the breath test 'may be offered against [him].' After reading the [rights and consequences] form, [the officer] asked defendant, '[W]ill you take a breath test?' Defendant responded that he would not."

*Id.* at 334-35 (ellipsis in original; some brackets in original). Before trial, the defendant moved to suppress evidence of his refusal to consent to the breath test and argued that the admission of his refusal would violate his rights under Article I, section 9. *Id.* at 335. The court denied his motion,

---

[2] Defendant does not advance an argument based on Article I, section 12, of the Oregon Constitution and the prohibition against compelled self-incrimination; thus, we express no opinion on that issue and note only that there is a separate line of cases as discussed by *State v. Shevyakov*, 311 Or App 82, 489 P3d 580 (2021).

and the state presented the refusal as evidence of the defendant's guilt at trial. *Id.*

The defendant appealed his judgment of conviction, again arguing that his refusal to take a breath test was an invocation of his right under Article I, section 9, to refuse to consent to a warrantless search and that his exercise of that constitutional right may not be used as substantive evidence of his guilt. *Id.* at 336. The Supreme Court agreed that a search of one's breath is protected under Article I, section 9, and that that provision requires law enforcement either to obtain a warrant or justify the search pursuant to a valid exception to the warrant requirement before performing a search. *Id.* at 337-38.

Because a defendant's assertion of their constitutional rights may not be used as substantive evidence of their guilt, the court announced a new test to determine the admissibility of a refusal to take a breath test. The state, as the party seeking to introduce evidence of the refusal, has the burden to establish its admissibility. *Id.* at 343. To meet that burden, the state must demonstrate that an officer's request for a breath test "could reasonably be understood only as a request to provide physical cooperation and not as a request for constitutionally-significant consent to search." *Id.*

Applying the test to the officer's request in that case, the court determined that the state did not meet its burden to establish that the defendant's refusal was admissible as evidence of his guilt. *Id.* The officer's question—"[W]ill you take a breath test?"—was ambiguous. *Id.* That is, the defendant could have reasonably understood the question as a request for "consent to search, thereby establishing a warrant exception," or as a request that the defendant "physically submit to a test that was justified by a warrant exception." *Id.*

Returning to the case before us, defendant contends that the *Banks* rule on requests to perform breath tests applies with equal force to requests to perform FSTs. She argues that, consistent with *Banks*, because the deputies' requests for her to perform FSTs were ambiguous as to whether the deputies were requesting physical cooperation

or constitutionally significant consent, the state failed to carry its burden.

The state reads *Banks* differently. It contends that the rule announced in *Banks* hinged on a statutory right to refuse to physically cooperate with a breath test and that there is no similar statutory right for FSTs. Specifically, the state contends that ORS 813.100(2) (2017), *amended by* Or Laws 2019, ch 475, § 1, prohibited testing a person's breath if the person refused to undergo the test.[3] In ORS 813.135 (2017), *amended by* Or Laws 2019, ch 475, § 5, the state argues that no such prohibition exists for FSTs.[4] As the state views it, because a person has no statutory right to refuse an FST, a request to perform FSTs "is not obscured by a statutory right to refusal" that exists for breath tests. Thus, the state contends that, because of that statutory distinction, *Banks* does not apply to refusals to perform FSTs. Alternatively, even if *Banks* does apply, the state remonstrates that the deputies made it clear that their requests were only for physical cooperation; thus, the requests did not implicate defendant's constitutional rights, and the court properly admitted evidence of her refusals to perform the tests. As explained below, we are not persuaded that *Banks* can be interpreted so narrowly.

## B. *Analysis*

Article I, section 9, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." That provision

---

[3] ORS 813.100 (2017) provided, in part:

"(2) No chemical test of the person's breath or blood shall be given, under subsection (1) of this section, to a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance, if the person refuses the request of a police officer to submit to the chemical test after the person has been informed of consequences and rights as described under ORS 813.130."

[4] ORS 813.135 (2017) provided:

"Any person who operates a vehicle upon premises open to the public or the highways of the state shall be deemed to have given consent to submit to field sobriety tests upon the request of a police officer for the purpose of determining if the person is under the influence of intoxicants if the police officer reasonably suspects that the person has committed the offense of driving while under the influence of intoxicants in violation of ORS 813.010 or a municipal ordinance. Before the tests are administered, the person requested to take the tests shall be informed of the consequences of refusing to take or failing to submit to the tests under ORS 813.136."

mandates that law enforcement obtain a warrant before conducting a search unless an exception to the warrant requirement applies. *State v. Steele*, 290 Or App 675, 681, 414 P3d 458 (2018) (noting that warrantless searches are *per se* unreasonable unless the search is conducted in accordance with a recognized exception). Voluntary consent to search is one such exception. *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992). When a person refuses to consent to a search, that refusal invokes the person's constitutional right to insist that the government obtain a warrant, and thus evidence of the refusal may not be admitted at trial as evidence of their guilt. *Banks*, 364 Or at 342.

Those constitutional protections apply to FSTs just as they apply to breath tests because, like breath tests, FSTs are searches within the meaning of Article I, section 9. *See State v. Nagel*, 320 Or 24, 31, 880 P2d 451 (1994) (explaining that FSTs involve "a series of specialized and unusual acts designed to elicit information that [the] defendant would not have exposed to the public without the officer's direction" and concluding that the administration of FSTs "constitutes a search within the meaning of Article I, section 9"); *see also State v. Maddux*, 144 Or App 34, 41, 925 P2d 124 (1996) (holding that, where a defendant voluntarily consents to a request to perform FSTs, the performance of the tests does not violate Article I, section 9). Consequently, because the deputies did not obtain a warrant and because defendant refused to provide consent, if we determine that the deputies' questions were requests that defendant waive her constitutional right against unreasonable search, her refusal to waive that right "cannot be admitted at trial as evidence of [her] guilt." *Banks*, 364 Or at 342.

The implied-consent statutes identified by the state do not serve to alter that constitutional premise and, in any event, the FST statutes reflect the same reality as those for breath tests: A person may choose to refuse the tests. *See* ORS 813.135 (2017) (noting that "the person requested to take the [FSTs] shall be informed of the consequences of refusing to take or failing to submit to the tests"); ORS 813.136 (2017) (providing that, "[i]f a person refuses or fails to submit to field sobriety tests as required by ORS 813.135,

evidence of the person's refusal or failure to submit is admissible in any criminal or civil action"). Further, the consequences imposed for refusing to take or submit to an FST—admissibility of the refusal in a criminal or civil action—are the same consequences that the defendant in *Banks* challenged as unconstitutional if they were imposed as a result of failing to give express consent. 364 Or at 342-43. Thus, for breath tests and FSTs, a person retains a statutory right to decide whether to perform the test and, in effect, whether to revoke the consent implied by statute. Accordingly, we conclude that the reasoning of *Banks* applies equally to FSTs.

Therefore, the state may introduce evidence of a defendant's refusal to perform FSTs if it demonstrates that a law enforcement officer's request to perform FSTs "could reasonably be understood only as a request to provide physical cooperation and not as a request for constitutionally-significant consent to search." *Id*. at 343. If the request was ambiguous—that is, if it can reasonably be understood as either "asking defendant to physically submit to a test that was justified by a warrant exception," or as "asking defendant for [his, her, or their] consent to search, thereby establishing a warrant exception,"—then the state has not met its burden, and evidence of the refusal to perform FSTs is inadmissible. *Id*. Accordingly, we must consider whether, for both the October 21, 2017, and January 6, 2018, stops, the state met its burden of showing that the deputies' questions could be understood only as requests for physical cooperation. After reviewing the record, we conclude that the state did not meet that burden for either stop.

To recapitulate, the *Banks* court concluded that the state could not meet its burden because the officer's question to the defendant—"[W]ill you take a breath test?"—was ambiguous as to whether he was asking for physical cooperation or asking the defendant for his consent to conduct the test. Here, during the October 2017 stop, Brown told defendant that he wanted to administer FSTs and asked defendant, "Is that something that you would voluntarily consent to doing tonight?" After defendant declined, Brown continued trying to persuade her, saying "if you consented to the field sobriety tests and I was to administer those and you don't

show indicators of impairment \*\*\* you're going to be able to drive home." Similarly, during the January 2018 stop, Hohl asked defendant if she "would be willing to consent to some field sobriety tests," and Osborne asked if she would "volunteer to do some field sobriety tests" and noted that the FSTs were "voluntary tests" that defendant could refuse. That the deputies later informed her that they were asking her to submit to "purely physical" tests, read her the *Rohrs* admonishment, and asked for her "cooperation," is not enough to meet the burden required by *Banks*. That standard requires that the requests be "solely" for physical cooperation such that it "could reasonably be understood only as a request to provide physical cooperation."[5] *Id.* Here, during both stops, the deputies used language that could reasonably have been interpreted as a request that defendant voluntarily "consent to search, thereby establishing a warrant exception," or as a request that she "physically submit to a test that was justified by a warrant exception." *Id.* Accordingly, applying *Banks*, the state did not establish that defendant's refusals were admissible as evidence of her guilt, and the trial court erred in denying the motion to suppress.

Having determined that the trial court erred, we must determine whether that error was harmless. *See, e.g., State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (explaining that, under Article VII (Amended), section 3, of the Oregon

---

[5] The state has conceded as much in other cases where a search of the underlying records in those cases reveals that an officer read the *Rohrs* admonishment but also used language suggesting that they were asking for constitutionally significant consent to search. *See State v. Martin*, 321 Or App 361 (2022) (nonprecedential memorandum opinion) (conceding that *Banks* applies where the trooper first told the defendant that performing the FSTs is a "voluntary thing" but later read the *Rohrs* admonishment warning him that "refusal to submit to physical tests" could be used against him); *State v. Ramirez-Carmona*, 313 Or App 533, 495 P3d 213 (2021) (conceding that *Banks* applies where the trooper told the defendant that performing the FSTs was "voluntary," read the *Rohrs* admonishment asking the defendant to submit to "purely physical" tests, and then asked if he consented to the tests); *State v. Stills*, 299 Or App 194, 447 P3d 80, *rev den*, 365 Or 769 (2019) (conceding that *Banks* applies where the deputy asked the defendant if he was willing to perform FSTs, gave the *Rohrs* admonishment from memory—including asking if he would "take some voluntary, purely physical" tests, described and demonstrated the tests, and again asked if the defendant would perform the tests). Although the state contends that, in those cases, its concession was based on the narrow or unique circumstances of the particular case, each involved—as here—a law enforcement officer using language implicating both a request for constitutionally significant consent and language implicating a request for physical cooperation.

Constitution, an appellate court will affirm a judgment if there is "little likelihood that the particular error affected the verdict"). The state elicited evidence of defendant's refusal to perform FSTs numerous times throughout the trial and reminded the jury of defendant's refusal during closing argument. In addition, the court instructed the jury that it may consider her refusal in determining whether she was under the influence of intoxicants. In light of the record below, we readily conclude that the trial court's error was not harmless as to the DUII convictions. *See State v. Ramirez-Carmona*, 313 Or App 533, 537-38, 495 P3d 213 (2021) (concluding that the trial court's error in allowing evidence of defendant's refusal to perform filed sobriety tests in a DUII prosecution was not harmless where, given the nature of the evidence, jury may have relied on that refusal to convict). We further conclude that the trial court's error was harmless as to the reckless driving convictions because the state did not rely on that evidence in its closing argument; rather, the state emphasized the evidence of defendant's erratic driving for both incidents, including swerving into oncoming traffic, repeatedly accelerating and decelerating in a way that could have caused a collision, and nearly crashing four times in a mile stretch.

### III.   DEFENDANT'S REMAINING ASSIGNMENTS OF ERROR

Defendant next challenges the admission of a urine sample obtained following the October 2017 stop, contending that the trial court erred when it denied her motion to suppress the sample. Defendant consented to providing the sample following her arrest and the discovery of a pill bottle in her car, and the sample was positive for various substances. Because the deputies testified that they could not be certain where they found the pill bottle, the trial court suppressed evidence of its discovery; however, the court admitted evidence of the urine analysis after it concluded that defendant's consent to provide a urine sample was attenuated from any misconduct. Defendant argues that the search and discovery of the pill bottle was a violation of her rights under Article I, section 9, and thus that her consent to the urine analysis was a product of police misconduct that

also must be suppressed. *See State v. Unger*, 356 Or 59, 86, 333 P3d 1009 (2014) (adhering to the principle that, where a defendant provides voluntary consent following police misconduct, the evidence must be suppressed unless the state can show that the consent was "independent of, or only tenuously related to, the unlawful police conduct"). Even assuming that discovery of the pill bottle was a constitutional violation, we agree with the trial court's determination that, on this record, the state met its burden of proof that defendant's consent to the urine analysis was sufficiently attenuated from any misconduct. In particular, the state elicited evidence that the officers did not attempt to capitalize on the discovery of the pill bottle to obtain defendant's consent, defendant gave her consent after an officer gave her *Miranda* warnings and after being taken to a different location from where the pill bottle was discovered, and defendant demonstrated that she was capable of and willing to refuse police requests. Accordingly, we reject defendant's challenge to the admission of the urine sample following the October 2017 stop.

In defendant's final two assignments of error, she contends that the trial court erred in denying her motion to suppress evidence obtained under the January 2018 warrant and in ruling that Osborne, a certified DRE, could use a website to identify the pills found in her vehicle. We reject defendant's challenge to the warrant because it is not preserved for our review, and we further conclude that we need not reach defendant's challenge to Osborne's testimony because the record could develop differently on remand.

Convictions on Counts 1 and 3 reversed and remanded; remanded for resentencing; otherwise affirmed.